SCHUTT REALTY COMPANY AND ANOTHER v. JOHN J. MULLOWNEY, d. b. a. EMPIRE WRECKING & SALVAGE COMPANY, AND ANOTHER.[1]

June 11, 1943.

No. 33,342.

[1]Reported in 10 N. W. (2d) 273.

*Victor M. Petersen,* for appellant John J. Mullowney.

*Fowler, Youngquist, Furber, Taney & Johnson,* for appellant American Surety Company of New York.

*Robert Cowling,* for respondents.

JULIUS J. OLSON, JUSTICE.

This was an action to recover stipulated damages by reason of the failure of defendant Mullowney to wreck within a stipulated time the old and massive structure known as the "Exposition Building" in Minneapolis. It has an interesting history, especially to the "old-timers" of that city. An article appearing in Vol. 1 of the "History of Minneapolis," by the Reverend Dr. Marion D. Shutter, at pages 146-149, describes this unusual building in an interesting and instructive way. In another article, comparatively recent, which appeared in the *Minneapolis Times Tribune* of January 12, 1940, at page 15, many facts about the building are re-

cited. We shall not cover them all, but we give a few brief excerpts from this article which are of historical significance.

The Exposition Building, built in 1885, was a huge structure, located "at the north end of the Third avenue bridge." It contained a floor area of 367,500 feet, and was at the time of its erection "acclaimed as the greatest engineering feat west of Chicago." It "was Minneapolis' pride and joy and ostensibly thrived, but it proved to be a financial flop, and at the end of eight years its doors were closed." It was the place where "Benjamin Harrison was renominated for the presidency in the 1892 Republican convention and President McKinley stood at the north entrance and gave the nation's welcome to the homecoming 13th Minnesota Regiment" in 1899. During the eight years of its existence as an exposition building, its "rafters rang [with] the voices of Patti, Nordica, Campanari and Melba and the waltz melodies of the famous Johann Strauss orchestra."

Some 500 tons of metal radiators, pipes, and beam joists were estimated to be within its walls. It covered an area of about 90,000 square feet, the dimensions of the main structure being approximately 266.8 x 326.3 feet. The grounds upon which it was built had an area of about five and one-half acres. The walls, which were of brick and stone, were about two and one-half feet thick. It was considered "Minneapolis' biggest wrecking job." Defendant Mullowney, a contractor of many years' experience in the wrecking business, undoubtedly recognized the risks involved.

The parties to the wrecking contract employed simple and direct language in expressing the terms of their agreement. We find nothing in it indicating room for difference of opinion as to what was to be done and the time within which the work was to be completed. The contractor agreed to pay, and in fact paid, $4,000 to plaintiffs, the owners of the property, for the value of the material salvaged. This, plus the work of wrecking and cleaning up the premises, constituted the contract price for the job.

The contract provisions giving rise to this litigation are paragraphs VI and IX. (Plaintiffs are the first parties therein and

Mullowney the second party.) These paragraphs read:

"VI. Second Party agrees to complete the wrecking and leveling as herein provided for of the northerly one-half of said building within five (5) months from the date of the execution of this agreement, and possession of that part of said premises and the street frontage thereto shall be surrendered to the First Parties in a completed condition within said time. Second Party agrees that the entire operation to be performed by the said Second Party as herein provided shall be completed within ten months from the date of the execution of this agreement."

"IX. The Second Party further agrees that, in the event he fails to complete either the whole or any part of the operations herein agreed by him to be performed within the times specified herein, he will forfeit to the First Parties the sum of $1,000.00, for each and every month or major fraction thereof which shall elapse from and after the time herein set for the completion of said part of said work in default, as liquidated damages for said default and to cover any loss which may be occasioned to the said First Parties by reason of said failure, and that this agreement on the part of said Second Party shall be made one of the conditions which are guaranteed by the surety bond hereinbefore referred to."

To guarantee "the full and complete performance" of the contract, the contractor agreed to furnish, and did so furnish and provide, a surety performance bond for $10,000. Defendant surety company is such surety.

That this structure had long ago outlived the use for which it was originally intended and designed cannot be doubted. As pointed out in the *Times Tribune* article to which we have referred:

"The building remained vacant for many years except for use for an occasional concert or meeting. In 1903, the National Stock Food Co., owned by the M. W. Savage interests, occupied the structure and remained until 1917, when the government took it over to train student soldiers. It was returned to the Savage company in

1920 and sold in 1935 when the company liquidated. It has been vacant since."

Because of the increase in the population of the city from 100,000 in 1885, when the Exposition Building was erected, to 492,370 in 1940, there was a large and natural expansion of the business centers of the city. The locale of the Exposition Building became "a shopping center" instead of a show place for agricultural or industrial products. A large area of potentially valuable property lay unused because this massive, unwieldy, and wholly unsuitable building occupied the site. The steadily growing demands of population and business and the progress of the city required that the building and its site be adapted to the commercial needs of the community. Accordingly, the owners, as foresighted businessmen, undertook the project of wrecking it and for this purpose entered into the agreement here involved.

At the conclusion of the trial the parties severally moved for a directed verdict. Plaintiffs' motion was founded upon the claim that, since the evidence showed that Mullowney had failed to comply with the terms of his contract in respect to timely performance and no extension of time or other modifying circumstances appeared in the evidence, therefore they deemed themselves entitled to the $1,000 per month fixed by the contract as their measure of recovery. The contractor and his surety, as a basis for their motion severally urged that "the stipulated damage clause" was in fact a penalty and as such unenforceable; furthermore, that "no damage by reason of any deductions made by" the Coca Cola Company was "a direct and consequential result of any breach of contract * * * on the part of the defendant Mullowney." In ruling upon these motions the court was of the opinion that the attacked provision "can properly be construed as a contract for liquidated damages, especially in view of the evidence which we have now received. The discrepancy is not so great as counsel would seem to imply. I think the deduction from the Coca Cola Company contract, $2,500, was a legitimate item; that added to the $480, which I consider another legitimate item to be considered, brings it up to substantially

$3,000. The liquidated damage clause calls for only $4,000 [at the rate of $1,000 per month during more than four months' delay in finishing the job]. The discrepancy in the opinion of the Court, is not so great as to make this a penalty." Accordingly, plaintiffs' motion was granted and that of defendants denied.

In explanation of the $2,500 item mentioned by the court in reference to the Coca Cola Company contract, the record shows that plaintiffs, in reliance upon their agreement with Mullowney, contracted to sell this property to the Coca Cola Company and to give it possession on a day certain well within the time limited by the agreement here involved. Because of Mullowney's delay, plaintiffs could not give that company possession as promised. Plaintiffs' contract with the Coca Cola Company provided for stipulated damages at the rate of $500 per month during the time possession was withheld from it. With regard to the $480 item, this represented expenses incurred and paid by plaintiffs to clean up the premises to comply with its contract obligations with the Coca Cola Company and which Mullowney had agreed to perform under his contract with plaintiffs.

From an order denying defendants' alternative motion for judgment or a new trial, they "jointly and severally appeal."

The crucial legal problem presented, and that which defendants deem vital in this case, depends upon the validity of the so-called stipulated damage clause. Is it in fact one for a penalty rather than for liquidated damages?

■ We may safely assume that when these parties entered into their contractual engagements plaintiffs expected, and had a right to rely upon, complete and timely performance by Mullowney. Nor should we assume that he had any hidden purpose to avoid his promises and engagements. That is the motivating cause for parties to take the time and trouble of reducing their mutual engagements to writing. As a successful man in his line of endeavor, Mullowney knew what his job was and the time it would take to perform it. In McGuire v. J. Neils Lbr. Co. 97 Minn. 293, 298, 107 N. W. 130, 132, we held: "Performance is, as the term implies, such a thorough

fulfilment of a duty as puts an end to obligations by leaving nothing more to be done."

■ "The term 'liquidated damages' signifies the damages the amount of which the parties to a contract stipulate and agree, when the contract is entered into, shall be paid in case of breach. It is well settled that the parties to a contract may stipulate in advance as to the amount to be paid in compensation for loss or injury which may result in the event of a breach of the agreement. A stipulation of this kind is enforceable, at least in those cases where the damages which result from a breach of the contract are not fixed by law or are in their nature uncertain and where the amount stipulated does not manifestly exceed the injury which will be suffered." 15 Am. Jur., Damages, p. 671, § 240. Supporting cases are found under notes 9 to 14, inclusive.

To determine whether this is a valid agreement so as to bring it within the doctrine of the cases upholding such contracts, we must go to the language of the contract itself and the facts and circumstances under which it was made. In Taylor v. Times Newspaper Co. 83 Minn. 523, 527, 86 N. W. 760, 762, 85 A. S. R. 473, we held:

"But where the actual damages are uncertain and difficult to ascertain or prove, are of a purely speculative character, and the contract furnishes no data for their ascertainment, the sum named and fixed by the parties for its breach is to be treated and held as liquidated damages. * * * In such cases the parties are presumed to have taken the uncertain and speculative character of the damages into consideration in entering into their engagements, and to have agreed upon the definite sum for the purpose of putting the question beyond controversy and dispute."

So, in Wise v. United States, 249 U. S. 361, 365, 366, 39 S. Ct. 303, 304, 63 L. ed. 647, 649, the court, in disposing of a situation much like the present one, said:

"There are, no doubt, decided cases which tend to support the contention advanced by appellant, but these decisions were, for the

most part, rendered at a time when courts were disposed to look upon such provisions in contracts with disfavor and to construe them strictly, if not astutely, in order that damages, even though termed liquidated, might be treated as penalties, so that only such loss as could be definitely proved could be recovered. The later rule, however, is to look with candor, if not with favor, upon such provisions in contracts when deliberately entered into between parties who have equality of opportunity for understanding and insisting upon their rights, as promoting prompt performance of contracts and because adjusting in advance, and amicably, matters the settlement of which through courts would often involve difficulty, uncertainty, delay and expense."

We find no difficulty in arriving at the same conclusion as did the trial court. And, since the contract and its interpretation were initially for the trial court, we see no reason for further discussion on this phase. *Cf.* 15 Am. Jur., Damages, p. 672, § 242, and cases under note 11.

■ Numerous errors are assigned in respect to the admission of evidence for the purpose of showing the probabilities with respect to forecasting the value of the use of this property. That its early use and possession were wanted is clear. To determine the exact value thereof was not only extremely difficult but, quite obviously, of the speculative type. The problems of certainty, the reasonableness of forecasting the future in the light of the present, and the many other items which go into contracts of the size and importance here involved were peculiarly matters for the parties themselves to consider and determine. There is no suggestion of fraud, overreaching, or mutual mistake. The parties were competent to contract. The owners and the contractor voluntarily assumed and agreed to perform their respective obligations as specified in their agreement. To make certain of timely performance, Mr. Mullowney was required to furnish a corporate surety bond, which he did. Since his liability is clear, that of his surety is likewise clear. It voluntarily assumed the responsibility of a paid surety. Each de-

fendant is justly bound in the amount determined below, and the order of the trial court is affirmed.

Affirmed.

MR. JUSTICE YOUNGDAHL took no part in the consideration or decision of this case.

[1]Reported in 10 N. W. (2d) 236.