WISCONSIN BELL, INC., (d/b/a Ameritech Wisconsin), a Wisconsin corporation, Petitioner-Respondent-Cross-Appellant,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Appellant-Cross-Respondent,

MCI TELECOMMUNICATIONS CORPORATION, WorldCom Technologies, Inc., AT&T Communications of Wisconsin, L.P. and TCG Milwaukee, d/b/a AT&T Local Services, Co-Appellants-Cross-Respondents.

Court of Appeals

*No. 02–2783. Oral argument August 5, 2003.—Decided August 19, 2003.*

2003 WI App 193

(Also reported in 670 N.W.2d 97.)

On behalf of the respondent-appellant-cross-respondent, the cause was submitted on the briefs of *Michael S. Varda* of *Public Service Commission of Wisconsin*, Madison. There was oral argument by *Michael S. Varda*.

On behalf of the co-appellants-cross-respondents, the cause was submitted on the briefs of *Anne E. Rea* and *Sherry A. Knutson* of *Sidley Austin Brown & Wood*, Chicago, Illinois; *Niles Berman* and *Janet Kelly* of *Wheeler, Van Sickle & Anderson, S.C.*, Madison; *Clark M. Stalker* and *Douglas W. Trabaris* of *AT&T Communications*, Chicago, Illinois; *William Single, IV* and *Brian J. Leske* of *WorldCom, Inc.*, Washington, DC; and

*John R. Harrington* of *Jenner & Block, LLC*, Chicago, Illinois. There was oral argument by *Niles Berman* and *Douglas W. Trabaris*.

On behalf of the petitioner-respondent-cross-appellant, the cause was submitted on the briefs of *John E. Flanagan* and *Jordan J. Hemaidan* of *Michael Best & Friedrich LLP*, Madison; *Theodore A. Livingston, John E. Muench* and *Demetrios G. Metropoulos* of *Mayer, Brown, Rowe & Maw*, Chicago, Illinois; *Steven R. Beck* of *Ameritech Wisconsin*, Milwaukee; and *John T. Lenahan* of *Ameritech Corporation*, Chicago, Illinois. There was oral argument by *Demetrios G. Metropoulos* and *John E. Flanagan*.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. FINE, J.   AT&T Communications of Wisconsin, L.P., TCG Milwaukee (d/b/a AT&T Local Services), MCI Telecommunications Corporation, WorldCom Technologies, Inc., and the Public Service Commission of Wisconsin appeal from a modified trial-court judgment vacating part of an order issued by the Commission. Wisconsin Bell, Inc. (d/b/a Ameritech Wisconsin), cross-appeals from the same judgment.[1] The sole issue on this appeal is whether the Commission acted within its statutory authority when it imposed what it characterizes as a "remedy plan" to ensure that Wisconsin Bell will make its facilities available fairly and efficiently to its competitors. The trial court, in a well-written and

---

[1] As we see from the caption to this case, Wisconsin Bell, Inc., does business under the trade name of Ameritech Wisconsin. Although the parties refer to Wisconsin Bell as "Ameritech," we see no reason not to use the name under which the company is incorporated.

carefully reasoned decision, held that the remedy plan was structured as a prohibited penalty. We agree and affirm.[2]

## I.

¶ 2.  The monopoly days of the Ma Bell of either our youth or of our institutional memory are gone. The old American Telephone and Telegraph Company spawned not only a gaggle of multi-generational off-spring but its once ubiquitous Bakelite black telephones have given way to marvels beyond the dreams of most,

---

[2] Wisconsin Bell's cross-appeal asks us to "modify the Circuit Court Decision to include instructions that the Commission not impose any remedy plan other than through the federally mandated interconnection agreement process, and that it may impose remedy payments only after conducting the required notice and hearing process," which it contends is mandated by state law. The modified judgment we affirm, however, vacated the remedy plan, and remanded the matter to the Commission for whatever further procedures it deemed appropriate. We decline Wisconsin Bell's invitation to provide the Commission with a detailed road map to guide a journey the Commission may or may not take. First, giving advisory opinions is beyond the scope of legitimate appellate review. *State v. Robertson*, 2003 WI App 84, ¶ 32, 263 Wis. 2d 349, 368–369, 661 N.W.2d 105, 114. Second, we assume that the Commission will not knowingly venture beyond the boundaries of its authority. *See Ashleson v. Labor & Indus. Review Comm'n*, 216 Wis. 2d 23, 34, 573 N.W.2d 554, 562 (Ct. App. 1997) (agency procedures are clothed with presumption of regularity). Further, insofar as Wisconsin Bell's arguments provide alternate bases to affirm the trial court's modified judgment, we do not address them. *Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed); *State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989) (cases should be decided on the "narrowest possible ground").

even a bare decade ago.[3] And competition among Ma Bell's progeny and others seeking a slice from the telecommunications pie is fierce. Congress passed the Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (1996), to, as phrased by the Act's pre-

[3] Alexander Graham Bell may or may not have "invented" the telephone. Telephone Tribute, *at* http://telephone tribute.com/timeline.html (last modified May 21, 2003). He was, however, awarded its patent in 1876. *Ibid.* He offered his invention to the telecommunications giant of his era for a one-time fee of $100,000, but was rebuffed:

> In 1876, Alexander Graham Bell and his financial backer, Gardiner G. Hubbard, offered Bell's brand new patent (No. 174,465) to the Telegraph Company - the ancestor of Western Union. The President of the Telegraph Company, Chauncey M. DePew, appointed a committee to investigate the offer. The committee report has often been quoted. It reads in part:
>
>> "The Telephone purports to transmit the speaking voice over telegraph wires. We found that the voice is very weak and indistinct, and grows even weaker when long wires are used between the transmitter and receiver. Technically, we do not see that this device will be ever·capable of sending recognizable speech over a distance of several miles.
>>
>> "Messer Hubbard and Bell want to install one of their 'telephone devices' in every city. The idea is idiotic on the face of it. Furthermore, why would any person want to use this ungainly and impractical device when he can send a messenger to the telegraph office and have a clear written message sent to any large city in the United States?"

*Ibid.* (quoting Warren Bender, A.D. Little, Inc.). As Winston S. Churchill reflected in his 1930 reminiscence of his first thirty years, from 1874 to 1904: "Everything I was sure or taught to be sure was impossible, has happened." WINSTON S. CHURCHILL, MY EARLY LIFE 67 (Simon & Schuster 1996) (1930). Of course, there are infinitely more "impossible" things yet to happen.

amble, "promote competition and reduce regulation in
order to secure lower prices and higher quality services
for American telecommunications consumers and en-
courage the rapid deployment of new telecommunica-
tions technologies." Among the ways to achieve these
goals is to have so-called "incumbent local exchange
providers" (companies like Wisconsin Bell, who own the
telephone infrastructure in a community, *see* 47 U.S.C.
§ 251(h)(1)), share their facilities with their competi-
tors. *See generally AT&T Corp. v. Iowa Utils. Bd.*, 525
U.S. 366, 371–373 (1999). The Federal Communications
Commission has called the Act a "momentous step of
requiring that the incumbent [local exchange provid-
ers] open the traditionally non-competitive local ex-
change and exchange access markets to competition in
order to foster the entry of alternative service provid-
ers." *Matter of Application by Bell Atlantic New York*, 15
F.C.C.R. 3953, 3956 (1999). Once they do so, the Act
allows the incumbent local exchange providers to ex-
pand beyond their communities and enter the lucrative
long-distance market. *Ibid.*; 47 U.S.C. § 271. The trial
court characterized the prospect of entry into the
long-distance market as Congress's "carrot"—the incen-
tive for incumbent local exchange providers to elimi-
nate the historical barriers to competitive local ex-
change service.

¶ 3.  As noted, Wisconsin Bell, a Ma Bell descen-
dant, is an incumbent local exchange provider. By
virtue of that incumbency, it controls the infrastructure
necessary for the provision of telecommunications ser-
vices in the relevant area, which the Commission deci-
sion characterizes only as "many major urban areas of
Wisconsin." The new folks on the block, those who want
a piece of the action without having to build or provide
their own facilities, are known as "competitive local

199

exchange carriers." The corporate co-appellants are "competitive local exchange carriers," and they need access to Wisconsin Bell's facilities—designated as "operational support systems."[4] Under the law, Wisconsin Bell has to share these services, and it must share fairly—it may not relegate the dregs to its competitors or the retail customers of those competitors. *See* 47 U.S.C. § 251(a)–(e),(g), & (h); and 47 U.S.C. § 259.

¶ 4.   Congress recognized the important role state regulatory bodies, like the Commission, have in fulfilling the Congressional mandate for deregulation, technical growth, and consumer benefit, and gave them broad berth within their respective areas of responsibilities. *See* 47 U.S.C. § 251(c)(4)(B), (c)(6) & (d)(3); and 47 U.S.C. § 252(a), (b)(4), & (d)–(f). The main Wisconsin statute governing the Commission's responsibilities in connection with the issue presented by this appeal is Wis. Stat. § 196.219, the "Protection of Telecommunications Consumers" law. Section 196.219 "was part of 1993 Wis. Act 496, the 'Information Superhighway Act,' taken up by the legislature in special session to partially deregulate the telecommunications utilities and encourage development of a competitive 'telecommunica-

---

⁑ [4] The Commission decision describes "operational support systems" as "generally refer[ring] to systems by which an incumbent local exchange provider makes wholesale service available to competitive local exchange carriers []. These systems may have a combination of manual and electronic interfaces. Major system components may include pre-ordering; ordering and provisioning; maintenance and repair; network performance; unbundled elements; operator services and directory assistance; system performance; service center availability and billing." (Acronym omitted.) The specifics of the complex components of what makes up operational support systems and how they are implemented are not material to our decision.

tions marketplace.' " *Public Serv. Comm'n v. Wisconsin Bell, Inc.*, 211 Wis. 2d 751, 759 n.4, 566 N.W.2d 496, 500 n.4 (Ct. App. 1997). As we will see, other provisions of WIS. STAT. ch. 196 apply as well.

¶ 5. This case flows from, as phrased by its Final Decision, the Commission's *sua sponte* decision "to investigate and determine whether or not [Wisconsin Bell's operational support systems] for wholesale transactions with its competitors operate without discriminatory impact upon the competitors and provide access to [Wisconsin Bell]'s network." As the Commission's decision relates, most of the complex issues surrounding its investigation were resolved either by the Commission or by "extensive negotiations" by the parties assisted by the Commission's staff and a "consulting facilitator," and that this cooperation enhanced "the public interest in maximum competition" by having "fair 'rules of engagement' " developed by "the market place participants themselves." Cooperation and negotiation are consistent with the Congressional goal of having incumbent local exchange providers attempt to work out fair and reasonable terms with their new competitors, the competitive local exchange carriers, under which the incumbents will supply the necessary operational support systems to the competitors. *See* 47 U.S.C. § 252(a). Congress also wanted the state regulatory bodies to help the negotiation process by either mediation, 47 U.S.C. § 252(a)(2), or compulsory arbitration, 47 U.S.C. § 252(b). There was one major issue, however, that the parties were not able to resolve, and, ultimately, was imposed by the Commission on its own: how to ensure that Wisconsin Bell does not discriminate against the competitive local exchange carriers in their access to the operational support systems.

## II.

¶ 6. As noted, the Commission set the parameters of an operational-support-systems plan under which Wisconsin Bell would supply support services to the competitive local exchange carriers and this plan was based partly on the parties' agreements and partly on the Commission's dictates. None of the parties on this appeal challenges that plan. Rather, Wisconsin Bell contends that the Commission did not have authority to impose what it calls its "remedy plan," which the Commission hoped would make the support-systems plan self-enforcing.

¶ 7. In its findings of fact underlying its decision to impose its remedy plan, the Commission determined:

- "All parties agree that there should be a remedy plan"; and

- "It is reasonable to base a remedy plan on the performance measurements standards and benchmarks adopted earlier [by the Commission in the case]."

None of the parties disputes these findings. Indeed, both sides, Wisconsin Bell on the one hand, and the competitive local exchange carriers on the other hand, submitted proposed remedy plans. The Commission rejected those plans, and, as noted, imposed one of its own, which is the subject of this appeal. Portions of the Commission's plan were based on Wisconsin Bell's proposal.

¶ 8. The Commission's core finding in support of its remedy plan is:

A reasonable remedy plan will encourage [Wisconsin Bell] to provide nondiscriminatory wholesale service comparable to its own retail service *and impose a*

> *monetary disincentive upon [Wisconsin Bell] if it fails to deliver that quality of service.*

(Emphasis added.) Wisconsin Bell contends that the "monetary disincentive" imposed by the Commission is really a penalty because it is not tied to any actual damage or harm that might be suffered by either the competitive local exchange carriers or their retail customers, and, as such, it was beyond the Commission's power. We agree.

## III.

### A.

■

¶ 9. Applying Occam's razor, we focus on the heart of the dispute and cut away the technical-specifications arcana. Simply put, the Commission's remedy plan lumps together all the transactions that comprise Wisconsin Bell's obligations to supply operational support systems to competitive local exchange carriers, and, after balancing those transactions where Wisconsin Bell complied with the applicable benchmarks against those transactions where Wisconsin Bell did not comply, it decided that whenever Wisconsin Bell is out-of-compliance "at a 95 percent confidence level," Wisconsin Bell must make "remedy payments" on *every* transaction—even those that complied with the benchmarks. The Commission's decision explained:

> The Commission finds that once it has been determined at a 95 percent confidence level that discrimination has occurred, every transaction that a [competitive local exchange carrier] conducted with [Wisconsin Bell] that was included in that measure of performance should be subject to remedy payments. Reaching a

> finding that discrimination has occurred means that the very process [Wisconsin Bell] uses for providing service to the [competitive local exchange carrier] must be discriminatory. Accordingly, it is reasonable for a plan to make remedy payments on all transactions that were subjected to that discriminatory process. All transactions, which were subjected to that discriminatory process, consist of all transactions that were included in that measure of performance that was found to be discriminatory.

The trial court showed how, in simplified form, the Commission's remedy plan would work: "For example, if [Wisconsin Bell] was in the process of filling a transaction of 1000 orders [for a competitive local exchange carrier] and missed the due date on 70 of them, the Commission would require [Wisconsin Bell] to make remedy payments [on] all 1000 [competitive local exchange carrier] transactions in the entire order, even to the [competitive local exchange carriers] whose orders were filled on time."

¶ 10. As we see from both the Commission's decision and the trial court's explanation, the Commission's remedy plan is not compensatory; the Commission does not contend that making Wisconsin Bell pay assessments on those transactions that *complied* with the applicable operational-support-systems standards, because other transactions that did not comply exceeded a base number, is tied to any actual damage or harm suffered by either the competitive local exchange carriers or their retail customers. The Commission and the competitive local exchange carriers argue, however, that the Commission's remedy plan is nevertheless authorized by Wis. Stat. §§ 196.02(1) and 196.37(2). These grants of general authority provide:

WISCONSIN STAT. § 196.02(1):

> JURISDICTION. The commission has jurisdiction to supervise and regulate every public utility in this state and to do all things necessary and convenient to its jurisdiction.

WISCONSIN STAT. § 196.37(2):

> If the commission finds that any measurement, regulation, practice, act or service is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise unreasonable or unlawful, or that any service is inadequate, or that any service which reasonably can be demanded cannot be obtained, the commission shall determine and make any just and reasonable order relating to a measurement, regulation, practice, act or service to be furnished, imposed, observed and followed in the future.

The Commission submits that it has the power to impose what it calls the "[r]emedy assessments" because they "are 'necessary and convenient' " to the jurisdiction of the Commission, WIS. STAT. § 196.02(1), and constitute a "just and reasonable order," even though those assessments are not tied to actual harm or damage. We disagree.

## B.

¶ 11.  Unlike situations where a state agency resolves issues within its statutory authority, to which we give varying degrees of deference, we give no deference to the initial question of whether the agency's action is within its statutory authority. *Wright v. Labor & Indus. Review Comm'n*, 210 Wis. 2d 289, 293, 565 N.W.2d 221, 222–223 (Ct. App. 1997). We also review *de novo* the

trial courts decision whether the agency is acting within its authority. *See Wisconsin Bell*, 211 Wis. 2d at 753, 566 N.W.2d at 498.

¶ 12. "As a creature of the legislature, the commission has only such powers as the legislature expressly confers upon it, or those that are 'necessarily implied' by the statutes under which it operates, specifically, chapter 196 STATS." *Wisconsin Bell*, 211 Wis. 2d at 754, 566 N.W.2d at 498 (quoted source omitted). But this does not mean that the Commission has carte blanche. To the contrary: " 'Any reasonable doubt as to the existence of an implied power in an agency should be resolved against the exercise of such authority.' " *Id.*, 211 Wis. 2d at 756, 566 N.W.2d at 499 (quoted source and alteration omitted). *Wisconsin Bell* is central to our analysis.

¶ 13. In *Wisconsin Bell*, the Commission sought to punish Wisconsin Bell for allegedly violating "various service quality standards" by seeking, in the Commission's own name, forfeitures from Wisconsin Bell. *Id.*, 211 Wis. 2d at 753–754, 566 N.W.2d at 498. The Commission based its authority on WIS. STAT. § 196.219(4), which provides:

ENFORCEMENT. (a) On the commissions's own motion or upon complaint filed by the consumer, the commission shall have jurisdiction to take administrative action or to commence civil actions against telecommunications utilities or providers to enforce this section.

(b) The commission may, at its discretion, institute in any court of competent jurisdiction a proceeding against a telecommunications utility or provider for injunctive relief to compel compliance with this section, to compel accounting and refund of any moneys col-

lected in violation of this section or for any other relief permitted under this chapter.

*Wisconsin Bell*, 211 Wis. 2d at 754–755, 566 N.W.2d at 498–499. The Commission conceded, however, that Wis. Stat. § 196.219(4)(a) did not authorize it to seek forfeitures. *Wisconsin Bell*, 211 Wis. 2d at 755, 566 N.W.2d at 498–499. It thus focused on the words "any other relief permitted under this chapter" in § 196.219(4)(b), and contended that it could seek such "relief" under Wis. Stat. § 196.66 (the general forfeiture statute) and under Wis. Stat. § 196.44(3) (chapter 196's general enforcement provision).[5] *Wisconsin Bell*, 211 Wis. 2d at 755, 566 N.W.2d at 499.

---

[5] Wisconsin Stat. § 196.66 reads in full:

**General forfeiture provisions. (1)** General Forfeiture; failure to obey. If any public utility violates this chapter or ch. 197 or fails or refuses to perform any duty enjoined upon it for which a penalty has not been provided, or fails, neglects or refuses to obey any lawful requirement or order of the commission or the governing body of a municipality or a sanitary commission or any judgment or decree of any court upon its application, for every violation, failure or refusal the public utility shall forfeit not less than $25 nor more than $5,000.

**(2)** Each day separate offense. Every day during which any public utility or any officer, agent, as defined in sub. (3) (a), or employee of a public utility fails to comply with any order or direction of the commission or to perform any duty enjoined by this chapter or ch. 197 shall constitute a separate and distinct violation under sub. (1). If the order is suspended, stayed or enjoined, this penalty shall not accrue.

**(3)** Considerations in setting forfeitures. (a) In this subsection, "agent" means an authorized person who acts on behalf of or at the direction of the public utility. "Agent" does not include a director, officer or employee of a public utility.

(b) A court imposing a forfeiture on a public utility or an agent, director, officer or employee of a public utility under this

207

¶ 14. WISCONSIN STAT. § 196.44(3), however, requires that actions to recover "[a]ny forfeiture, fine or other penalty" under chapter 196 be "brought in the name of the state" and *Wisconsin Bell* refused to expand the statutory limitation by applying notions of implied

chapter shall consider all of the following in determining the amount of the forfeiture:

1. The appropriateness of the forfeiture to the volume of business of the public utility.

2. The gravity of the violation.

3. Any good faith attempt to achieve compliance after the public utility, agent, director, officer or employee receives notice of the violation.

(4) TREBLE MAXIMUM FORFEITURES. (a) If an act or omission causes death or a life-threatening or seriously debilitating injury, and is subject to a forfeiture proceeding under this chapter, the maximum forfeiture that may be imposed shall be trebled.

(b) If a public utility fails to comply with any rule, order or direction of the commission after actual receipt by the public utility of written notice from the commission specifying the failure, the maximum forfeiture under sub. (1) shall be $15,000.

WISCONSIN STAT. § 196.44 reads in full:

**Law enforcement.** (1) DUTY OF COMMISSION. The commission shall inquire into the neglect or violation of the laws of this state by public utilities, or by their officers, agents or employees or by persons operating public utilities, and shall enforce all laws relating to public utilities, and report all violations to the attorney general.

(2) DUTIES OF ATTORNEY GENERAL AND DISTRICT ATTORNEYS. Upon request of the commission, the attorney general or the district attorney of the proper county shall aid in any investigation, hearing or trial had under this chapter, and shall institute and prosecute all necessary actions or proceedings for the enforcement of all laws relating to public utilities or telecommunications providers, and for the punishment of all violations.

powers so as to include the Commission's action as one being brought "in the name of the state." *Wisconsin Bell*, 211 Wis. 2d at 756–762, 566 N.W.2d at 499–501. Further, and with special significance here, *Wisconsin Bell* held that although under Wis. Stat. § 196.219(4)(b) the Commission could seek "relief" authorized by chapter 196, the Commission could not seek either "penalties" or "punitive sanctions" because the statute does not give it that power. *Wisconsin Bell*, 211 Wis. 2d at 757–758, 566 N.W.2d at 499–500. The Commission does have the authority, however, to tie a utility's noncompliance with either the applicable statutes or Commission rules to the utility's future revenues *if* that tying is proportional to the harm and structured so as to be compensatory rather than punitive. *See Wisconsin Power & Light Co. v. Public Serv. Comm'n*, 181 Wis. 2d 385, 394–395, 511 N.W.2d 291, 294–295 (1994); *CenturyTel of the Midwest-Kendall, Inc. v. Public Serv. Comm'n*, 2002 WI App 236, ¶¶ 25–42, 257 Wis. 2d 837, 852–862, 653 N.W.2d 130, 138–143. The Commission may also order compensatory refunds for at least some past unlawful charges, *GTE North Inc. v. Public Serv. Comm'n*, 176 Wis. 2d 559, 567, 500 N.W.2d 284, 287–288 (1993), under circumstances the boundaries of which we need not survey here, *see State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989) (cases should be decided on the "narrowest possible ground"). The Commission's remedy plan does not fall within either grant of authority, irrespective of how broad those grants may be.

---

(3) Actions, character, venue. Any forfeiture, fine or other penalty under this chapter may be recovered as a forfeiture in a civil action brought in the name of the state in the circuit court of Dane County or in the county that would be the proper place of trial under s. 801.50.

¶ 15. The Commission's remedy plan, albeit prospective, is not compensatory. Additionally, the remedy plan's underlying rationale: namely, that specific instances where Wisconsin Bell would not meet the benchmark goals by the pre-set minimum level "means that the very process [Wisconsin Bell] uses for providing service to the [competitive local exchange carrier] must be discriminatory" is flawed.

¶ 16. As the trial court recognized, under the Commission's remedy plan one miss over the minimum level of permitted misses triggers assessments for *all* transactions, including all the transactions that *complied* with the Commission's standards for the sharing of operational support services. At the very least, therefore, assessments levied on *compliant transactions* have no relation to *any* losses that might be incurred by either the competitive local exchange carriers or their retail customers. Stated another way, Wisconsin Bell is *not* discriminating against a competitive local exchange carrier or its customers when Wisconsin Bell gives them the level of service mandated by the Commission. Assessments that are not related to harm or damage are penal, not compensatory. *See Kernz v. J.L. French Corp.*, 2003 WI App 140, ¶¶ 28–30, 266 Wis. 2d 124, __, 667 N.W.2d 751, 760–761 (stipulated or liquidated damages unrelated to actual harm is a penalty); *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411–413 (1947) ("liquidated damages" provision that was inserted in a contract in order to give government contractor incentive to meet contractual deadlines was a non-enforceable penalty when the liquidated damages were not related to the government's actual damage). As *Wisconsin Bell* tells us, imposition of non-compensatory

sanctions is beyond the Commission's power. *Wisconsin Bell*, 211 Wis. 2d at 757–758, 566 N.W.2d at 499–500.

¶ 17.   We affirm the trial court's judgment as modified.[6]

---

[6] Both the Commission and the competitive local exchange carriers contend that Wisconsin Bell either waived its right to contest the Commission's plan or is judicially estopped from doing so because Wisconsin Bell participated in the proceedings and the Commission's plan was based in part on the proposal submitted to it by Wisconsin Bell. Although it is true that Wisconsin Bell agreed that *some* remedy plan was appropriate, it certainly did not agree that a plan imposing a non-compensatory "monetary disincentive" trigger penalty was either appropriate or lawful. Thus, assuming without deciding that judicial estoppel applies to proceedings before administrative agencies, Wisconsin Bell has not asserted inconsistent positions and, therefore, the prerequisites to the application of judicial estoppel are not present here. *See State v. Petty*, 201 Wis. 2d 337, 347, 548 N.W.2d 817, 820 (1996) ("[J]udicial estoppel . . . is intended to protect against a litigant playing fast and loose with the courts by asserting inconsistent positions.") (internal quotation marks and quoted source omitted). Moreover, we reject out of hand the Commission's contention that the mere fact that Wisconsin Bell participated in the proceedings that led to the Commission's adoption of its remedy plan waived Wisconsin Bell's right to complain that the plan exceeded the Commission's statutory authority; unsurprisingly, the Commission gives us no authority for this unique proposition, and we have found none.

We also do not decide the Commission's challenge to the trial court's entry of preliminary injunctive relief. That issue is moot in light of our affirmance of the trial court's modification of the Commission's order, and we see no compelling circumstances that warrant reviewing the trial court's exercise of its discretion.

*By the Court.*—Judgment affirmed.