**In the Matter of QWEST'S WHOLESALE SERVICE QUALITY STANDARDS.**

No. A03–1409.

Supreme Court of Minnesota.

Aug. 18, 2005.

Larry D. Espel, John M. Baker, Jeanette M. Bazis, Greene Espel, P.L.L.P., Jason D. Topp, Qwest Corporation, Minneapolis, MN, for Appellant Qwest Corporation.

Mike Hatch, Attorney General, St. Paul, MN, for Minnesota Public Utilities Commission and Minnesota Department of Commerce.

Steven H. Alpert, Cassandra O. O'Hern, Assistant Attorneys General, St. Paul, MN, for Minnesota Public Utilities Commission.

Gregory R. Merz, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN,

Lesley J. Lehr, St. Paul, MN, for MCI, Inc., successor to WorldCom, Inc.

Mark J. Ayotte, Thomas Erik Bailey, Briggs and Morgan, P.A., Minneapolis, MN, for AT & T Communications of the Midwest, Inc.

Dan M. Lipschultz, Michael J. Bradley, Moss & Barnett, Minneapolis, MN, for Encore Communications, L.L.C., Global Crossing Local Services, Inc., McLeodU-SA, Inc., New Edge Networks, Inc., NorthStar Access, L.L.C., Onvoy, Inc., Rythms Links, Inc., Time Warner Telecom of Minnesota L.L.C., and US Link, Inc.

Virgina K. Zeller, Assistant Attorney General, St. Paul, MN, for Minnesota Department of Commerce.

W. Patrick Judge, Briggs and Morgan, P.A., St. Paul, MN, for Covad Communications Co.

Karen L. Clauson, Eschelon Telecon of Minnesota, Inc., Minneapolis, MN, for Eschelon Telecom of Minnesota, Inc.

Todd G. Hartman, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, for Time Warner Telecom of Minnesota L.L.C.

## OPINION

PAGE, Justice.

Petitioner Qwest Corporation (Qwest), an incumbent local exchange carrier (incumbent carrier), challenges a court of appeals decision affirming an order of the Minnesota Public Utilities Commission (MPUC) that established wholesale service quality standards, including self-executing payments for failure to meet the standards, for wholesale transactions between Qwest and so-called competitive local exchange carriers (CLECs).[1] In this appeal, Qwest raises two issues: (1) whether the MPUC's authority to establish wholesale service quality standards, including the use of fixed minimum performance standards, is preempted by the federal Telecommunications Act of 1996, 47 U.S.C. §§ 151–615(b) (2000) (the 1996 Act or the Act); and (2) whether the MPUC has authority under Minnesota law to impose self-executing payments for failure to meet these standards. We conclude that the MPUC's authority to establish wholesale service quality standards is not preempted. We also conclude that the MPUC lacks the authority under Minnesota law to impose self-executing payments for failure to meet those standards. Therefore, we affirm in part and reverse in part.

Congress passed the 1996 Act in an effort to foster competition in telecommunications markets, including local telephone markets. Until the 1996 Act was passed, states had the power to grant exclusive franchises to incumbent carriers, thereby creating a monopoly in each local telephone service area. The Act ended the long-standing state-sanctioned monopolies and fundamentally restructured local telecommunications markets. The Act's purpose is to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers

---

1. CLECs are new entrants into a local retail telephone market who either purchase or lease needed telecommunication services and facilities from the market's incumbent carrier. The CLECs involved in this case are AT & T Communications of the Midwest, Inc., Covad Communications Company, Encore Commu-nications, L.L.C., Eschelon Telecom of Minne-sota, Inc., Global Crossing Local Services, Inc., McLeodUSA, Inc., New Edge Networks, Inc., NorthStar Access, L.L.C., Onvoy, Inc., Rythms Links, Inc., Time Warner Telecom of Minnesota, L.L.C., US Link, and WorldCom, Inc.

and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104–104, purpose statement, 110 Stat. 56, 56 (1996). Because of the high cost of building a new telecommunications network infrastructure, the Act requires incumbent carriers, who own the existing infrastructure, to enter into agreements with CLECs that allow the CLECs to interconnect with the incumbents' existing networks and to purchase or lease telecommunications services and facilities at wholesale rates for resale to the CLECs' customers. 47 U.S.C. § 251(c)(2) (2000). The Act provides that if an incumbent carrier and a CLEC cannot reach an interconnection agreement, either party may seek arbitration before the state regulatory authority, here the MPUC. 47 U.S.C. § 252(b)(1) (2000).

In 1996, US West Communications, Inc. (US West), the predecessor to Qwest, arbitrated interconnection agreements with several CLECs before the MPUC. As a result of the arbitration, the MPUC imposed certain contract terms, including (1) a set of quality standards to be applied to the services and facilities that US West made available to the CLECs and (2) a system of "performance penalties" in the form of credits to the CLECs if US West failed to meet those quality standards. US West challenged the contract terms imposed by the MPUC in federal court, and the court upheld the validity of those terms. *See US West Communications, Inc. v. Garvey*, 55 F.Supp.2d 968, 1999 U.S. Dist. LEXIS 22042, at *34–41 (D.Minn. Mar. 30, 1999).

In 1999, US West entered into an Alternative Form of Regulation (AFOR) plan with the MPUC under Minnesota law. *See* Minn.Stat. §§ 237.76–.772 (2004). AFOR plans are intended to "provide a telephone company's customers with ser-

vice of a quality consistent with [the MPUC] rules at affordable rates, to facilitate the development of telecommunication alternatives for customers, and to provide, where appropriate, a regulatory environment with greater flexibility than is available under traditional rate of return regulation * * *." Minn.Stat. § 237.76. Qwest's AFOR plan applies to its retail customers and specifically excludes issues related to wholesale service quality standards and corresponding remedies.

Also in 1999, US West and Qwest sought to merge. In exchange for the MPUC's approval of the merger, Qwest agreed to participate in an expedited proceeding to set permanent wholesale service quality standards applicable to the services Qwest would provide to CLECs and waived its right to a contested case proceeding in connection with the merger filing. On June 28, 2000, the MPUC approved the merger and started the process of establishing permanent wholesale service quality standards.

While the proceedings for establishing permanent wholesale service quality standards were pending, Qwest applied to the Federal Communications Commission (FCC) to enter the long-distance telephone market. As part of the application process, Qwest was required to demonstrate that it would keep its local telecommunications network open to competition in a nondiscriminatory manner. *See* 47 U.S.C. § 271 (2000). In evaluating petitions to enter the long-distance market, the FCC relied on so-called Post–Entry Performance Assurance Plans, which were developed collaboratively by the regional Bell operating companies, including Qwest, competitive carriers, and state regulatory bodies, like the MPUC, to ensure the nondiscriminatory provision of wholesale local exchange services. Therefore, in conjunction with Qwest's application, the MPUC,

in July 2002, adopted the Minnesota Performance Assurance Plan (MPAP). The MPAP requires parity between Qwest's local telephone services to its competitors and its services to itself, its subsidiaries, and its retail customers after Qwest's entry into the long-distance market. To measure Qwest's compliance, the plan incorporates a long list of performance criteria. The MPAP also includes a remedy scheme that requires Qwest to pay its wholesale customers if the quality of its wholesale services falls below that provided to its retail customers.

In August 2002, the MPUC sought comments from Qwest and the CLECs with respect to the merits of adopting the MPAP as the permanent wholesale service quality standards. Concerned that Qwest could meet the MPAP parity criteria while manipulating the quality of the wholesale services in a way that would put the CLECs at a competitive disadvantage, the CLECs proposed modifying the MPAP in six quality-sensitive areas: installation, new service problems, jeopardy notice, service repairs, repeated service problems, and trunk blocking rate. Specifically, the CLECs proposed fixed minimum performance standards in those six areas. The CLECs also proposed the adoption of an enforcement mechanism consisting of self-executing payments to be made by Qwest to the CLECs for failure to meet the standards. Qwest was supportive of using the MPAP parity criteria as the wholesale service quality standards, but opposed the adoption of the fixed minimum performance standards and self-executing payments proposed by the CLECs.

In July 2003, the MPUC issued an order adopting the MPAP criteria as the permanent wholesale service quality standards, with modifications to include the fixed minimum performance standards in the six areas identified by the CLECs and the self-executing payments. After unsuccessfully seeking reconsideration and a stay of the July 2003 MPUC order, Qwest appealed. The court of appeals affirmed, holding that the MPUC did not violate federal or state law by imposing the wholesale service quality standards and that the imposition of the self-executing payments was within the MPUC's statutory authority, was supported by adequate evidence, and did not constitute an unlawful taking. *In re Qwest's Wholesale Serv. Quality Standards*, 678 N.W.2d 58, 67 (Minn.App.2004). We granted Qwest's petition for further review.

I.

Qwest first claims that the 1996 Act preempts states from regulating local telecommunications competition. Citing *AT&T Corp. v. Iowa Utilities Board*, Qwest asserts that by enacting the 1996 Act, "the Federal Government has taken the regulation of local telecommunications competition away from the States." 525 U.S. 366, 379 n. 6, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Qwest contends that the Supreme Court in *AT&T* implied that the states were preempted because Congress so fully occupied the field that there was no room for any state regulation. In the alternative, Qwest argues that the MPUC order violates the Act by adopting wholesale service quality standards for Qwest's Minnesota local exchange market that are inconsistent with the purposes of the Act, are not competitively neutral, and are not necessary to ensure quality service or to further competition.

The ultimate touchstone of federal preemption is congressional intent. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). Preemption may be express or implied. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141,

152–53, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Absent explicit preemption language, Congress's intent to preempt state law may be inferred when the federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* Alternatively, preemption may be found when state law actually conflicts with federal law. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Conflict preemption will be found when "it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Nordgren v. Burlington N.R.R. Co.,* 101 F.3d 1246, 1248 (8th Cir.1996) (quoting *Freightliner Corp. v. Myrick,* 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995)) (internal quotations omitted).

Qwest's contention that Congress intended to preempt the states entirely from regulating local telecommunications markets is contradicted by the express language of the Act. Although the Act clearly moves Congress into the regulation of local telecommunications services and makes the federal government the dominant regulator, it is equally clear from the Act's provisions that Congress has not fully occupied the field to the exclusion of the states. Each section of the Act dealing with local competition includes an express savings clause that preserves a regulatory role for the states. Therefore, the proper preemption question is whether the MPUC's order is consistent with the scope of the role Congress preserved for the states. *See Cipollone,* 505 U.S. at 517, 112 S.Ct. 2608 (explaining that, when Congress has made express provision for the scope of preemption, it is generally not necessary to infer intent from the substantive provisions of the law).

The stated purpose of the MPUC's order is "to promote high quality service and the development of competitive local phone markets." The 1996 Act expressly preserves a role for the states regarding each of those two goals: quality service and competitive markets. Regarding service quality, the Act provides:

> Nothing in this section shall affect the *ability of a State to impose,* on a *competitively neutral* basis * * * requirements *necessary* to preserve and advance universal service, protect the public safety and welfare, *ensure the continued quality* of telecommunications services, and safeguard the rights of consumers.

47 U.S.C. § 253(b) (2000) (emphasis added). State action to foster competition is also explicitly addressed in the Act:

> Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are *necessary to further competition* in the provision of telephone exchange service or exchange access, as long as the State's requirements are *not inconsistent with this part* or the [Federal Communications] Commission's regulations to implement this part.

47 U.S.C. § 261(c) (2000) (emphasis added). Moreover, the Act generally preserves the states' role related to access and interconnection regulation:

> [T]he [Federal Communications] Commission *shall not preclude the enforcement of any regulation, order, or policy of a State commission* that—
>
> (A) establishes access and interconnection obligations of local exchange carriers;
>
> (B) is consistent with the requirements of this section; and

(C) does not substantially prevent implementation of requirements of this section and the purposes of this part. 47 U.S.C. § 251(d)(3) (2000) (emphasis added). Thus, section 253(b) of the Act preserves the ability of the states, and the MPUC, to impose, on a competitively neutral basis, requirements necessary to ensure continued quality of telecommunications services, and section 261(c) preserves the right of states, and the MPUC, to impose requirements necessary to further competition as long as the requirements are not inconsistent with the Act or FCC regulations.

■ We must determine, then, whether the MPUC's adoption of wholesale service quality standards falls within those statutory parameters.[2] That is, whether such standards are necessary to ensure continued quality and further competition, competitively neutral, and not inconsistent with the Act and related regulations. Qwest argues that the wholesale service quality standards conflict with the Act because the standards are not necessary, not competitively neutral, and not consistent with the Act.

*Necessity to Ensure Continued Quality and to Further Competition*

Qwest argues that in adopting the wholesale service quality standards the MPUC did not make adequate findings of necessity in that the MPUC did not find either Qwest's existing service or the MPAP standards inadequate. Qwest's argument regarding its existing service is misguided. In establishing the wholesale service quality standards, the MPUC's goal was to "promote high quality service and the development of competitive local phone markets." Therefore, the question before the MPUC was not whether Qwest's existing service was adequate, but rather what level of wholesale service was necessary to ensure quality and foster competition.

■ Qwest also argues that the MPUC order never specifically found the wholesale service quality standards "necessary" to ensure quality of service. "[A] statutory reference to 'necessary' must be construed in a fashion that is consistent with the ordinary and fair meaning of the word, *i.e.*, so as to limit 'necessary' to that which is required to achieve a desired goal." *GTE Serv. Corp. v. F.C.C.*, 205 F.3d 416, 423 (D.C.Cir.2000) (interpreting the holding in *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999)).

Before the MPUC, the CLECs argued that as new entrants into the local telephone market they tend to serve a disproportionately large number of quality-sensitive customers, while as the incumbent carrier Qwest tends to serve a disproportionately large number of quality-tolerant customers. According to the CLECs, fluctuations in service quality are more likely to cause quality-sensitive customers to change service providers while the same fluctuations would not cause quality-tolerant customers to change. Thus, the CLECs argued that Qwest's ability to manipulate service quality under the MPAP criteria, which require only parity, would have a negative impact on their ability to

---

**2.** The dissent states "it is axiomatic that the savings clauses of the Act do not exempt from preemption state actions that stand as direct obstacles to the goals of the Act or directly conflict with the particular means selected by the Act," suggesting that inferred "conflict" preemption could supersede express savings clause provisions. This suggestion appears to overstate the force of conflict preemption, but we need not resolve that question because, as noted, the savings clauses at issue here themselves expressly preclude state action that is inconsistent with the Act or prevents its implementation.

retain customers. The CLECs, therefore, proposed the fixed minimum performance standards for six quality-sensitive areas, including installation, new service problems, jeopardy notice, service repairs, repeated service problems, and trunk blocking rate.

In its order, the MPUC separately discussed each of the six areas, contrasted the parties' arguments, evaluated the relative merits of those arguments, and, in the end, found that although the MPAP would ensure nondiscriminatory service, it would not ensure high-quality service. The MPUC further found that the MPAP "simply leaves too much uncertainty about the quality of services to permit the growth of competition," while fixed minimum performance standards would provide "stable, predictable quality" that "consumers can expect from each provider." Finally, the MPUC found that requiring the fixed minimum performance standards in the six identified areas would ensure "that wholesale services provided by Qwest to its competitors are of sufficient quality to promote the development of a competitive local telecommunications market." Accordingly, based on those findings, the MPUC concluded that fixed minimum performance standards would provide reliability and consistency in those six areas, ensuring service quality and fostering competition. Even though the MPUC did not couch its findings in terms of being "necessary" to achieve the dual goals of ensuring high-quality service and fostering competition, given the findings identified above, we are satisfied that the MPUC established that the adoption of the fixed minimum performance standards was necessary to achieve the MPUC's dual goals of ensuring high-quality services and fostering competition.

*Competitive Neutrality*

Qwest next claims that the fixed minimum performance standards as adopted are not "competitively neutral" because they require higher levels of service to CLECs than that which Qwest provides for its subsidiaries and retail customers. Qwest also claims that the standards burden it for the benefit of the CLECs. Qwest cites *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67 (2d Cir.2002), to support its argument that the fixed minimum performance standards are not competitively neutral because they are imposed on Qwest and not the CLECs. In essence, Qwest views "competitively neutral" regulation as regulation that does not affect competitive balance.

In response, the CLECs argue that Qwest, as the incumbent carrier, has long enjoyed the advantage of having a monopoly in the local telephone market and that relying on the MPAP alone would allow such a fundamental inequality to continue because under the parity criteria Qwest is in the position to determine service quality for all others. The CLECs also argue that having fixed minimum performance standards in quality-sensitive areas leaves little room for Qwest to manipulate service quality. In other words, the CLECs view "competitively neutral" to mean regulation that levels the playing field between carriers who are new entrants into the market and incumbent carriers, recognizing incumbent carriers' competitive advantage in the market due to their ownership of the local exchange infrastructure.

Contradicting Qwest's claim that the "competitively neutral" standard requires that state regulation allowed under the Act have no impact on competition, the 1996 Act expressly permits state regulation of incumbent carriers for the purpose of fostering competition. *See* 47 U.S.C. § 261(c) ("Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services

that are necessary to further competition * * *."). In this case, recognizing Qwest's competitive advantage, the MPUC, in its order, attempted to address that imbalance by requiring Qwest to provide consistent and reliable wholesale services in six specific areas. The MPUC argues that allowing Qwest to provide inconsistent, albeit "equal," wholesale services would undermine competition by leaving Qwest room to manipulate the quality of its wholesale service quality. Thus, the MPUC argues that the adoption of the fixed minimum performance standards ensures that the quality of wholesale services will be consistent and reliable, and puts Qwest and CLECs on a leveled playing field. We agree.

As discussed above, the fixed minimum performance standards are necessary to ensure quality service and to foster competition. As the incumbent carrier, Qwest has a competitive advantage over the CLECs. Qwest's incumbent advantage, absent some mechanism limiting Qwest's ability to manipulate the quality of wholesale services provided to the CLECs, would be maintained and perhaps even grow. That could result in anything but competitive neutrality. The fixed minimum performance standards, imposed in only the six areas found to be most sensitive for new entrants to the market, merely prevent Qwest from using its competitive advantage to the detriment of the CLECs. By leveling the playing field between Qwest and the CLECs in this manner, Qwest is not put at a competitive disadvantage.

As for Qwest's reliance on *TCG*, we note that the regulation at issue here is different from the local regulation at issue in that case. In *TCG*, the franchise fee imposed by the city applied only to CLECs, thus burdening the CLECs and at the same time preserving, perhaps enhancing, the competitive advantage of the incumbent carrier. 305 F.3d at 79. The Second Circuit therefore held that the fee was not "competitively neutral." *Id.* at 80. In contrast, the fixed minimum performance standards at issue here do not disadvantage Qwest. The standards only require that Qwest provide its wholesale customers, the CLECs, certain minimum levels of service. Qwest retains complete control over the services it provides to its subsidiaries and retail customers and may, if it so chooses, provide to them the same level of service as it provides to its wholesale customers. Leveling the playing field between Qwest and the CLECs in a way that does not burden Qwest does not run afoul of the Act's requirement that state regulation be competitively neutral.

### Consistency with the Provisions of the Act

Qwest also argues that the Act was intended to reduce regulation and that the fixed minimum performance standards are inconsistent with that goal, and are therefore preempted as inconsistent with the Act. While Qwest is correct that one of the Act's goals was to reduce regulation, 47 U.S.C. §§ 253(b) and 261(c) expressly preserve the states' authority to impose regulations to ensure quality and further competition. Therefore, state regulation designed to ensure quality and further competition, such as the MPUC order, is not inconsistent with the Act's goal of reducing regulation.

Qwest also argues that the Act allows state regulators to require no more than parity between the incumbent carrier's wholesale and retail services. Citing the Eighth Circuit decision in *Iowa Utilities,* Qwest argues that "[p]lainly, the Act does not require [an incumbent carrier] to provide its competitors with superior quality interconnection." *Iowa Utils. Bd. v. F.C.C.,* 120 F.3d 753, 812 (8th Cir.1997), *aff'd in part, rev'd in part, and rem'd sub*

*nom., AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). We disagree.

What the Act requires is that incumbent carriers provide CLECs interconnection that is "at least equal in quality" to that provided to their subsidiaries and retail customers. 47 U.S.C. § 251(c)(2)(C) (2000).[3] By its interpretation of the phrase "at least equal in quality," Qwest would essentially make parity between wholesale and retail services not the floor (as in "at least equal in quality"), but the ceiling (as in "no more than equal in quality"), for the interconnection services provided by an incumbent carrier to CLECs. That interpretation is inconsistent with the Eighth Circuit's holding in *Iowa Utilities.* Under *Iowa Utilities,* the phrase "at least equal in quality" "establishes a *floor* below which the quality of the interconnection may not go." 120 F.2d at 812 (emphasis added). Other federal courts have reached conclusions that are consistent with that holding. *See, e.g., Ind. Bell Tel. Co. v. McCarty,* 362 F.3d 378, 393 (7th Cir.2004) (holding that the phrase "at least equal" contemplates that something more than equal is allowable, rather than preempted); *MCI Telecommunications Corp. v. N.Y. Tel. Co.,* 134 F.Supp.2d 490, 506 (N.D.N.Y.2001) (finding that the state commission acted lawfully in ordering an incumbent carrier to restore services to a CLEC at a higher level before implementing similar services to all CLECs); *AT&T Communications of Southern States, Inc. v. GTE Florida, Inc.,* 123 F.Supp.2d 1318,

1329 (N.D.Fla.2000) (concluding that the state commission could require an incumbent carrier to provide a certain number of portability solutions to a CLEC, even though the incumbent carrier does not provide the same services to its own subsidiaries).

To the extent that the *Iowa Utilities* decision precludes requiring more than parity, as argued by Qwest, it is distinguishable in several respects. In *Iowa Utilities,* the court ultimately struck down the FCC regulation at issue because it required the incumbent carrier to provide the CLECs superior quality services whenever requested by the CLECs. 219 F.3d at 758. Here, rather than empowering the CLECs to dictate the quality of service that the incumbent carrier must provide to them, the MPUC made that determination in adopting the fixed minimum performance standards that require Qwest to provide wholesale services that are of measurable, predictable, and consistent quality. Second, the requirement struck down in *Iowa Utilities* was imposed by the FCC, whose authority under the Act is not necessarily identical to that of state regulators. Finally, given the "*at least* equal in quality" wording of the statute, we find the decisions of other federal courts cited above that rejected a strict parity rule more persuasive.

The dissent would hold that imposition of minimum performance standards is preempted because it frustrates the goals of the Act to foster competition and reduce regulation. In our view, the dissent's em-

---

**3.** Section 251(c)(2)(C) of the Act provides:
  (c) Additional obligations of incumbent local exchange carriers
    * * * *
    (2) Interconnection
  The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network—

  * * * *
    (C) that is *at least equal in quality to* that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection[.]
  (Emphasis added.)

phasis on "the deregulatory purpose and market-based approach of the Act" goes too far. Although the commentator cited by the dissent would prefer more complete deregulation, he acknowledges that is not what Congress enacted. Adam Thierer, *Four More Years … of the Status Quo? How Simple Principles Can Lead Us out of the Regulatory Wilderness,* 57 Fed. Comm. L.J. 215, 216 (Mar.2005). In fact, rather than faulting the failure of the courts to find preemption, as implied by the dissent, the commentator urges Congress to enact more complete preemption:

> The only way [the patchwork of policies] will end is by *federal lawmakers* taking the same difficult step they had to take when deregulating airlines, trucking, railroads, and banking: preemption. They must get serious about the national policy framework mentioned in the preamble of the Telcom Act by comprehensively preempting state and local regulation in this sector.

*Id.* at 219 (emphasis added). Indeed, if more complete preemption is desirable or necessary to achieve the Act's goals, as the author recognizes, Congress must make that determination. Not this court.

Nor can we agree with the dissent's characterization of the impact of the minimum service standards in this case. First, the dissent notes that the Act provides for negotiation of interconnection agreements between CLECs and incumbent carriers and concludes that imposition of the minimum standards "alters the baseline of interconnection negotiations and fundamentally changes the Act's process of initiating new market entries." But here, Qwest agreed to bypass the negotiation stage when it agreed to participate in an expedited proceeding before the MPUC to set permanent wholesale service quality standards in exchange for approval of the merger between Qwest and US West. Sec-

ond, the dissent also concludes that "Qwest is burdened with fixed performance standards its competitors can ignore." On the contrary, the minimum performance standards apply only to services that Qwest's competitors must rely on Qwest, as the incumbent carrier, to provide. It is because of that dependence of competitors on Qwest in these particularly sensitive service areas that the MPUC found minimum standards necessary to ensure fair competition. Third, despite the emphasis on the argument that the standards require Qwest to provide higher quality service to its competitors, it is noteworthy that the MPUC found that the minimum service standards imposed "largely coincide[ ] with service quality standards arising from other documents," primarily the standards for interconnection agreements with CLECs set in the 1996 arbitration and upheld by the federal district court and the standards for service to Qwest's own customer set in its AFOR plan.

The dissent also concludes that the minimum service standards conflict with the "competitively neutral" language of section 253(b) of the Act. The dissent states that "[i]f the requirement of competitive neutrality is to have any meaning, it cannot merely be that a state regulation be designed to increase competition." We agree that not every regulation designed to increase competition would be permissible. But we do not agree with the dissent's conclusion that "state regulations must not handicap or help the parties in the new competitive market the Act aims to construct." Congress expressly preserved the states' authority to impose requirements "necessary to further competition." The dissent's restrictive view reads that authorization out of the Act. At worst, the confluence of these phrases creates ambiguity regarding the scope of preemption—or conversely the role preserved for the

states. In this situation, finding preemption is disfavored:

> Where, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." This assumption provides assurance that "the federal-state balance," will not be disturbed unintentionally by Congress or unnecessarily by the courts.

*Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (citations omitted).

We must also note that the cases cited by the dissent do not hold that limited regulation such as that imposed by the MPUC intended to level the playing field, and thus ensure quality and enhance competition, is preempted. As explained, the court in *TCG* struck down a fee imposed on CLECs but not the incumbent carrier. Similarly, the FCC order relied on in *US West Communications v. M.F.S. Intelenet, Inc.,* 193 F.3d 1112 (9th Cir.1999), involved a mechanism that required new entrants to bear all the costs of number portability. Thus, in both circumstances addressing competitive neutrality there was an extra burden imposed on the new entrants to the market, favoring the incumbent carriers, rather than leveling the playing field. In *Cablevision of Boston, Inc. v. Public Improvement Commission of Boston,* 184 F.3d 88, 105 (1st Cir.1999), the court held that the "competitively neutral" language in a different provision of the Act (concerning regulation of rights-of-way) did not *"require* local authorities to purposefully seek out opportunities to level the telecommunications playing field." (Emphasis added.) Failing to find an affirmative obligation to level the playing field is not the equivalent of ruling that such regulation is prohibited. The court went on to explain: "If, however, a local authority decides to regulate for its own reasons * * *, § 253(c) would require that it do so in a way that avoids creating unnecessary competitive inequities among telecommunications providers." *Id.* The regulation here is consistent with that view. In essence, the MPUC found that mandating no more than parity in the six sensitive service areas would create unnecessary competitive inequities favoring the incumbent provider and therefore imposed minimum service standards to avoid those inequities.

We conclude that the Act does not by its express terms or implication entirely preempt the states from regulating local telecommunications services. Rather, we conclude that the express provisions of the Act preserve a role for the states that includes ensuring adequate quality and fostering competition, if done within the parameters prescribed in the Act. Further, we conclude that the fixed minimum performance standards required by the MPUC are within the proper scope of the state's authority because they are necessary to achieve the dual purposes of ensuring quality service and fostering competition, and they are competitively neutral and consistent with the Act. Accordingly, we hold that the wholesale service quality standards adopted by the MPUC are not preempted by the Act.

### II.

We now turn to the issue of the MPUC's authority under Minnesota law to require that Qwest make self-executing payments to the CLECs if Qwest fails to meet the wholesale service quality standards. In its order, the MPUC found that the payments were necessary to enforce the standards and that the CLECs were likely to suffer damages if Qwest did not meet the stan-

dards. Qwest challenges the MPUC's authority to impose the self-executing payments as an enforcement mechanism or, as argued by the CLECs, for liquidated damages.[4] The question presented is one of first impression.

Qwest contends that the MPUC's only possible source for authority to order the self-executing payments comes from the MPUC's authority to impose administrative penalties under Minn.Stat. § 237.462 (2004),[5] which authorizes the MPUC to penalize knowing and intentional violations of a commission order. According to Qwest, section 237.462 does not authorize, either explicitly or implicitly, the type of payments in question here because as self-executing payments they require no showing of a knowing or intentional violation of a commission order before the payments

are imposed. Qwest further argues that the MPUC order also circumvents the limitations on an agency's authority to levy penalties under Minn.Stat. § 14.045, subd. 1 (2004),[6] which places limits on an agency's ability to levy a fine or penalty.

In response, the CLECs and the MPUC contend that neither section 237.462 nor section 14.045 is applicable to the self-executing payments because the payments are an enforcement mechanism, not a fine or penalty. They argue that the MPUC's authority to impose the payments is fairly implied by the language authorizing the MPUC to ensure high-quality telecommunications service under Minn.Stat. §§ 216A.05, subd. 1; 237.06; 237.081, subd. 4; 237.011; and 237.16, subd. 8 (2004).[7] They further argue that the re-

**4.** The payments in question have been variably referred to by parties as "self-executing payments," "penalty payments," "penalties," "performance penalties," "remedies," "stipulated damages," "liquidated damages," or payments necessary to enforce the wholesale service quality standards. While we refer to the payments as "self-executing payments" to be consistent with the Minnesota Wholesale Service Quality Plan, we view them as an enforcement mechanism in light of the parties' arguments.

**5.** Minnesota Statutes § 237.462 provides:
Subdivision 1. After a proceeding under section 237.081, the commission may issue an order administratively assessing monetary penalties for *knowing and intentional violations* of:
(1) sections 237.09, 237.121, 237.16, and 237.411 and any rules adopted under those sections;
(2) any standards, limitations, or conditions established in a commission order pursuant to sections 237.09, 237.121, 237.16, and 237.411;
* * * *
Subd. 9. * * * The imposition of administrative penalties in accordance with this section is *in addition to all other remedies available under statutory or common law.* The payment of a penalty does not preclude the use of other enforcement provisions,

under which penalties are not assessed, in connection with the violation or violations for which the penalty was assessed.
(Emphasis added.)

**6.** Minnesota Statutes § 14.045, subdivision 1, provides:
An agency may not, under authority of rule, levy a total fine or penalty of more than $700 for a single violation unless the agency has specific statutory authority to levy a fine in excess of that amount.

**7.** Minnesota Statutes § 216A.05, subdivision 1, provides:
The functions of the [MPUC] shall be legislative and quasi-judicial in nature[.]
Minnesota Statutes § 237.06 provides:
It shall be the duty of every telephone company to furnish reasonably adequate service and facilities for the accommodation of the public, and its rates, tolls, and charges shall be fair and reasonable for the intrastate use thereof.
Minnesota Statutes § 237.081, subdivision 4, provides:
Whenever the [MPUC] finds * * * (2) that any rate, toll, tariff, charge, or schedule, or any regulation, measurement, practice, act, or omission affecting or relating to the production, transmission, delivery, or furnishing of telephone service or any service in

quired payments are necessary to give effect to the wholesale service quality standards. In addition, the CLECs contend that the payments should be viewed as permissible liquidated damages because the payments will compensate the CLECs for any economic loss resulting from quality-sensitive customers losing confidence in the CLECs' ability to provide consistent service because of Qwest's failure to comply with the wholesale service quality standards.

■ Whether an agency acts within its statutory authority is a question of law to be reviewed de novo. *St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 39–40 (Minn.1989). The MPUC, "being a creature of statute, has only those powers given to it by the legislature." *Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n*, 369 N.W.2d 530, 534 (Minn.1985). "While express statutory authority need not be given a cramped reading, any enlargement of express powers by implication must be *fairly drawn and fairly evident* from the agency objectives and powers expressly given by the legislature." *Id.* (emphasis added). Neither an agency nor the courts may "enlarge the agency's powers beyond that which was contemplated by the legislative body." *Id.*

■ "Historically, we have been reluctant to find implied statutory authority" in the context of the MPUC's remedial power. *In re Northern States Power Co.*, 414 N.W.2d 383, 387 (Minn.1987). As a general rule, we resolve any doubt about the existence of an agency's authority against the exercise of such authority. *Id.* In *Peoples Natural Gas*, the MPUC ordered a public utility to refund charges collected under rates that the MPUC previously declared discriminatory. 369 N.W.2d at 532–33. The MPUC argued that it had "implied authority to refund in order to effectively correct overcharges or other unreasonable rates." *Id.* at 534. Recognizing that ratemaking was a complicated process, we nonetheless concluded that it was "not enough that the power to order refunds would be useful to the [MPUC] as an enforcement measure." *Id.* at 535. We held that the MPUC did not have either express or implied authority to order a refund of past revenue collections. *Id.* at 535–36; *see also N. States Power Co.*, 414 N.W.2d at 387–88 (holding that the MPUC had no implied authority to dismiss a ratemaking proceeding in its entirety as the result of deliberations tainted by the MPUC's conflict of interest).

In *In re Minnegasco*, 565 N.W.2d 706 (Minn.1997), we noted an exception to the

connection with telephone service, is in any respect unreasonable, insufficient, or unjustly discriminatory, or (3) that any service is inadequate, the commission shall make an order respecting the tariff, regulation, act, omission, practice, or service that is just and reasonable and, if applicable, shall establish just and reasonable rates and prices.

Minnesota Statutes § 237.011 provides:

The following are state goals that should be considered as the commission executes its regulatory duties with respect to telecommunication services:

\* \* \* \*

(4) encouraging fair and reasonable competition for local exchange telephone service

in a competitively neutral regulatory manner;

(5) maintaining or improving quality of service[.]

Minnesota Statutes § 237.16, subdivision 8, provides:

(a) [The MPUC] shall adopt rules \* \* \* using any existing federal standards as minimum standards and incorporating any additional standards or requirements necessary to ensure the provision of high-quality telephone services throughout the state. The rules must, at a minimum:

\* \* \* \*

(9) prescribe standards for quality of service[.]

general rule. In that ratemaking case, we held that the MPUC had the implied authority to impose a recoupment remedy to compensate a public utility for losses caused by an invalid commission order. *Id.* at 711. We based our decision on the statutory language and our earlier decision in *Northwestern Bell.*[8] *See Minnegasco,* 565 N.W.2d at 711–12. In essence, we held that in the face of ambiguous statutory language and the reversal of an unlawfully deficient rate order, the MPUC had the implied authority to impose a recoupment remedy. *See id.* We reasoned that if the MPUC did not have implied authority to impose the recoupment remedy, a public utility that ultimately prevailed in appealing a rate order would not have a meaningful remedy. *Id.* at 713.

■ Applying the above rules, we must determine whether the MPUC's authority to impose the self-executing payments is expressly granted by the statutes and, if not, whether such authority can be fairly implied from the statutory language. The MPUC is correct that it has broad statutory authority to regulate telecommunications services. *See* Minn.Stat. §§ 216A.05, subd. 1; 237.011. Under that broad authority, the MPUC may adopt rules as "necessary to ensure the provision of high-quality telephone services throughout the state," including "prescrib[ing] standards for quality of service." Minn.Stat. § 237.16,

subd. 8(a)(9). With respect to the MPUC's power to provide remedies for an incumbent carrier's failure to meet standards for quality of *retail* service, Minn. Stat. § 237.765(a)(5) (2004) expressly authorizes the MPUC to establish "appropriate remedies, including penalties and customer-specific adjustments or payments to compensate customers for specific quality of service failures, so as to ensure substantial compliance with the quality of service standards." Nowhere, however, does the statutory scheme expressly give the MPUC the power to provide remedies for failures to meet the wholesale service quality standards.[9] Thus, we must determine whether the MPUC's authority to impose the self-executing payments can be fairly implied from the statutory scheme.

In arguing that the authority can be fairly implied from the statutory scheme, the MPUC directs our attention to its statutory authority to ensure high-quality service under Minn.Stat. §§ 237.011(5) and 237.16, subd. 8(a). According to the MPUC, because the legislature could not address every nuance of utility regulation, the legislature has granted the MPUC broad authority. The MPUC further argues that its express authority to ensure just and reasonable rates under Minn.Stat. § 237.081, subd. 4., fairly implies its authority to require an acceptable level of service quality at the prices charged to the

---

**8.** *See Northwestern Bell Tel. Co. v. State,* 299 Minn. 1, 28–30, 216 N.W.2d 841, 858–59 (1974), where we held that the MPUC had the implied authority to order a refund to telephone subscribers when its rate order was reversed as unlawfully excessive.

**9.** We are aware that other states, such as Illinois and Utah, have regulations that impose self-executing remedy payments, similar to those in the MPUC's order. *See* Ill. Admin. Code tit. 83, § 731.305(c) (2004); Utah Admin. Code R746–365–7 (2004). However, unlike here, the statutes in those states ex-

pressly grant their regulatory bodies the power to establish remedies for quality standards. *See* 220 Ill. Comp. Stat. 5/13–712(g) (Supp. 2005) ("The Commission shall establish and implement carrier to carrier wholesale service quality rules and establish remedies to ensure enforcement of the rules."); Utah Code Ann. § 54–8b–17(2)(a), (3)(a) (2000) (stating that if the commission finds a telecommunications corporation violated the service quality rules, the commission may order the violator to remedy the violation and comply with the rules).

customers. The MPUC refers to our decision in *Minnegasco* as the support for finding implied authority in this case.

Likewise, the CLECs argue that the MPUC's express authority to ensure high-quality service fairly implies its authority to establish a compliance mechanism, such as the self-executing payments in question here. The CLECs urge us to follow the federal district court's decision in *US West Communications, Inc. v. Garvey*, 55 F.Supp.2d 968, 1999 U.S. Dist. LEXIS 22042, at *40–41 (D.Minn. Mar. 30, 1999), which found that the MPUC had power to require Qwest's predecessor to make remedial payments to CLECs for failure to meet certain wholesale performance standards.

As noted, we will not enlarge the MPUC's implied authority beyond that which can be fairly drawn and is fairly evident from the powers expressly granted to the MPUC by the legislature. *See Peoples Natural Gas Co.*, 369 N.W.2d at 534. As a result, we must look closely at the statutory scheme created by the legislature. Doing so, we see no language from which the authority for the MPUC to impose the self-executing payments can be fairly drawn. The problem we face is that, if nothing more than a broad grant of authority were needed to show that implied authority could be fairly drawn from the statutory scheme, the implied authority would be present in all cases in which the agency had a broad grant of authority. We declined to adopt such a sweeping rule in *Peoples Natural Gas. See id.* at 535. In that case, noting that we had "no ambiguous language to construe, unless perhaps the ambiguity of silence," we indicated that "we must look at the necessity and logic of the situation." *Id.* at 534. As in *Peoples Natural Gas,* we think it significant here that the legislature did not expressly provide for remedial authority with respect to

wholesale service quality standards even though it could have done so as it did in the case of quality standards for retail services. *See* Minn.Stat. § 237.765(a)(5). We also think it significant that the legislature has expressly provided the MPUC the authority to issue administrative penalties for violation of certain MPUC rules and orders. *See* Minn.Stat. § 237.462.

The exception we identified in *Minnegasco* does not help the MPUC's and the CLECs' cause. Unlike the situation in *Minnegasco*, in which we identified specific statutory language from which it would be inferred that the MPUC had the implied authority to impose a recoupment remedy, here, as noted above, no such language has been identified. *Minnegasco* is also distinguishable on its facts. *Minnegasco* involved a ratemaking case in which we were required to interpret statutory language that was "neither entirely clear nor free from all ambiguity." 565 N.W.2d at 712. In reconsidering the statutory language, we concluded that the MPUC had implied authority to provide for a recoupment remedy. *Id.* In doing so, we noted that "[n]othing in *Peoples Natural Gas* prevents a reasonable and just interpretation in the face of statutory ambiguity." *Minnegasco*, 565 N.W.2d at 712 (citing *Peoples Natural Gas*, 369 N.W.2d at 534). We also noted that, if no recoupment remedy were available, a public utility that prevailed in a rate case would have no remedy to compensate for its lost revenue caused by an unlawful rate order. *Minnegasco*, 565 N.W.2d at 713. We concluded that the inequity in denying Minnegasco a remedy was unacceptable. *Id.*

In contrast, in this case, like *Peoples Natural Gas* and unlike *Minnegasco*, the statutory language being interpreted is not, except in its silence, ambiguous. Also unlike *Minnegasco*, this case does not involve a utility seeking the recovery of rev-

enue lost as a result of an unlawful rate order. Moreover, the MPUC and the CLECs are not left without any remedy for Qwest's failures to meet the wholesale service quality standards. For example, the MPUC may seek administrative penalties under Minn.Stat. § 237.462. As subdivision 9 of section 237.462 points out, those penalties are "in addition to all other remedies available under statutory or common law."

Finally, we decline to adopt the reasoning of the federal district court in *Garvey*. The primary basis for not following the court's reasoning in *Garvey* is that, while the court in that case cited our decision in *Peoples Natural Gas*, the court provided no explanation or analysis why *Peoples Natural Gas* did not control the result. Notably, the same court subsequently reached a different result in *Qwest Corp. v. Minnesota Public Utilities Commission*, Civ. No. 03–3476 ADM/JSM, slip op. at 8 (D.Minn. Aug. 5, 2004), concluding that the MPUC lacked the authority to impose equitable relief.

For the reasons discussed above, we conclude that the MPUC does not have statutory authority, either express or implied, to impose the self-executing payments as an enforcement mechanism and therefore hold that the MPUC exceeded its statutory authority in ordering Qwest to make such payments for failure to comply with the wholesale service quality standards.[10]

We also conclude that the CLECs' argument that the payments should be viewed as permissible liquidated damages is unavailing. Generally, liquidated damages are fixed sums payable to a party when actual damages are difficult to ascertain or prove. *See Schutt Realty Co. v. Mullowney*, 215

Minn. 340, 346, 10 N.W.2d 273, 276 (1943). In this case, nothing in the record indicates that the payments are restricted to compensating the CLECs for difficult-to-ascertain losses that may result if Qwest fails to comply with the wholesale service quality standards. Moreover, it appears that the payments are not so restricted. The parties have, at various times throughout these proceedings, referred to the payments as "penalties" or "penalty payments." Indeed, in its order the MPUC supports its authority to impose the payments with a quote from the federal district court's decision in *Garvey*, which states: "The MPUC's authority to implement performance *penalties* can be fairly implied from its power 'to *ensure* the provision of high quality telephone services.'" 1999 U.S. Dist. LEXIS 22042, at *39–40 (first emphasis added). Liquidated damages, however, are not "penalties." *Schutt Realty Co.*, 215 Minn. at 346, 10 N.W.2d at 276. Because the payments here are not restricted to compensation for losses resulting from Qwest's failure to comply with the standards, they go beyond the scope of permissible liquidated damages. *See id.; see also Wis. Bell, Inc. v. Pub. Serv. Comm'n*, 267 Wis.2d 193, 670 N.W.2d 97 (2003) (holding that a "remedy plan" imposed a penalty on the ILEC because the assessment was not tied to any actual damage or harm suffered by the CLECs or their customers).

Affirmed in part and reversed in part.

ANDERSON, G. BARRY, J., (concurring in part and dissenting in part).

BLATZ, C.J., and HANSON, J., took no part in the consideration or decision of this case.

### CONCURRENCE & DISSENT

I agree that the Minnesota Public Utilities Commission (MPUC) lacks statutory

---

10. Having concluded that the MPUC does not have either express or implied authority to impose the self-executing payments, we need not address Qwest's argument regarding the MPUC's authority under Minn.Stat. §§ 237.462 and 14.045.

authority to require an incumbent local exchange carrier (ILEC) to make self-executing payments to its competitors for failure to comply with wholesale service quality standards. But because the MPUC's wholesale service quality standards frustrate the deregulatory purpose of the Federal Telecommunications Act of 1996, 47 U.S.C. §§ 151–615(b) (2000) (the Act), I would hold that the federal act preempts the MPUC's order establishing those standards.

The Telecommunications Act of 1996 fundamentally restructured the delivery of local phone service. Prior to the Act, state governments generally granted regional monopolies to heavily regulated local exchange carriers who provided local phone service to retail customers in their region. The Act facilitates entry of new phone service providers and encourages competition and deregulation by requiring regionally monopolistic ILECs to provide competitors with access to their existing networks. The stated purpose of the Act is to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."[11] Telecommunica-

tions Act of 1996, Pub.L. No. 104–104, purpose statement, 110 Stat. 56, 56 (1996). To these ends, the Act places three specific duties on ILECs, namely, to allow new, competing local exchange carriers (CLECs) to interconnect with the ILEC's local network, to provide CLECs access to unbundled parts or elements of the ILEC's network, and to sell its retail telecommunications services at wholesale rates to CLECs for resale. 47 U.S.C. § 251(c)(2)-(4) (2000). The Act places these duties on ILECs in light of the advantages of their longstanding monopoly and in order to encourage new market entry. But because the ultimate goals are competition and deregulation, the Act clearly and specifically defines the nature and scope of the ILEC's duties—the ILEC is not merely to be "used as a piñata." *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 573 (D.C.Cir.2004).

Here, the MPUC in July 2003 issued an order adopting permanent wholesale service quality standards which include fixed minimum performance standards in six areas. Because the MPUC's order places duties on the ILEC more onerous than those envisioned by the Act, I would hold that the Act preempts the MPUC's action.

---

11. Deregulation of telecommunications has been incomplete at best. Successful deregulation of other interstate industries such as truck transport and commercial aviation has included elimination of the federal regulatory bodies which formerly governed those enterprises. *See I.C.C. Termination Act of 1995*, Pub.L. No. 104–88, 109 Stat. 803; *Airline Deregulation Act of 1978*, Pub.L. No. 95–504, 92 Stat. 1705. The same is not true with regard to telecommunications deregulation. Instead, the scope of the F.C.C.'s power has grown substantially since deregulation. *See* Adam Thierer, *Four More Years of the Status Quo? How Simple Principles Can Lead Us Out of the Regulatory Wilderness*, 57 Fed. Comm. L.J. 215, 220 (Mar.2005). This, and the failure of the courts to find preemption of local regulatory authority, has led to a complex web of state and federal regulations touching every aspect of the industry, arguably negating the intended benefits of deregulation and the purposes of the Act. *See id.* at 219–20. The majority correctly notes that the commentator cited here argues that Congress should act to ensure preemption of state and local regulatory authority. *Id.* But the proposition that Congress should act to ensure preemption does not preclude this court from enforcing what Congress has already done. Whether Congress ultimately reforms telecommunications regulation, the fact remains that the standards imposed upon Qwest in the present case frustrate the purposes of the 1996 Act.

The Supremacy Clause of the Federal Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Today we are attempting to discern whether Congress, in passing the Telecommunications Act of 1996, has exercised its powers under the Supremacy Clause in a manner that preempts the MPUC from imposing burdens more onerous than those envisioned by the Act on the ILEC.

Preemption can occur in multiple ways. Congress may specifically state its intention to preempt state authority. Or, if a regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," state law is preempted. *Fid. Fed. Sav. Loan Assn. v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Finally, where state law and federal law actually conflict, state law is preempted. Conflict preemption of this type may occur in either of two situations first, "where it is impossible for a private party to comply with both state and federal requirements," or second, "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (internal citations omitted). It is this latter form of conflict preemption that pre-

cludes the MPUCs wholesale service quality standards.

We need not wonder whether, in general, Congress has preempted state regulation of local telecommunications competition. In the words of the Supreme Court, "[w]ith regard to the matters addressed by the 1996 Act, it unquestionably has." *AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 379 n. 6, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). But the Act also includes clauses which "save" certain areas of authority for state regulation, exempting them from preemption.[12] As the majority correctly notes, congressional intent to preempt can be inferred from the clauses exempting certain state regulations from preemption when Congress expressly defines the scope of permissible state regulation, the intent to preempt is manifest. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). The majority is also correct that the proper preemption question is "whether the MPUCs order is consistent with the scope of the role Congress preserved for the states." But it is axiomatic that the savings clauses of the Act do not exempt from preemption state actions that stand as direct obstacles to the goals of the Act or directly conflict with the particular means selected by the Act. Further, the Act itself explicitly disallows state regulations that are inconsistent with the Act or that prevent implementation of the Act.

**12.** 47 U.S.C. § 253(b) (2000), regarding service quality and consumer rights provides: Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis * * * requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

Likewise, 47 U.S.C. § 261(c), regarding requirements to foster competition provides:

Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange excess, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part.

*See* 47 U.S.C. 251(d)(3), 261(c) (2000). Thus, even some state regulations designed to ensure quality and further competition will not be saved from preemption. Here, the MPUCs order, though ostensibly intended to foster competition by "leveling the playing field," should be held preempted as an obstacle to the goals of the Act.

The duties the Act places on ILECs are precise obligations designed to encourage competition and reduce regulation. 47 U.S.C. 251(c)(2)(C) (2000) describes the duty of ILECs to provide CLECs with interconnection service. According to that section, the ILEC has the "duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carriers network * * * that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection." 47 U.S.C. § 251(c)(2)(C). As the majority notes, the Eighth Circuit has held that the phrase "at least equal in quality" denotes a "floor below which the quality of the interconnection may not go." *Iowa Util. Bd. v. F.C.C.*, 120 F.3d 753, 812 (8th Cir.1997). The majority argues that the Act, in establishing a floor below which

quality may not fall, allows state regulators to require something more than parity from the ILEC. But this view defies logic. The Act, in placing the duty of providing interconnection on the ILEC, defines that duty in a precise way so as to serve the ultimate goals of the Act, including fostering competition and reduced regulation. The Act thus envisions a situation where the ILEC, in negotiating interconnection agreements with new market entrants, must provide equal quality services, and *may*, if the ILEC and the CLEC so agree, provide services of superior quality.[13] Throughout this process, both parties understand what minimum is required of the ILEC. Changing the ILECs duty of interconnection to *require* superior quality thus alters the baseline of interconnection negotiations and fundamentally changes the Act's process of initiating new market entries.[14]

Further, the majority's view was squarely rejected by the Eighth Circuit. In rejecting an F.C.C. rule requiring superior quality interconnection, the Eighth Circuit stated, "[w]hile the phrase 'at least equal in quality' leaves open the possibility that incumbent LECs may agree to provide interconnection that is superior in quality

---

13. The ILEC is required to negotiate in good faith an agreement that accomplishes the Acts goals with new market entrants requesting interconnection services, 47 U.S.C. 251(c)(1), 252(a)(1) (2000), and if the parties fail to agree, the *state utility commission will arbitrate and resolve open issues.* 47 U.S.C. 252(b) (2000).

14. The majority notes that in the present case, Qwest agreed to bypass the negotiation stage and instead participate in an expedited proceeding before the MPUC to set permanent wholesale service quality standards. But it is difficult to understand how Qwest's agreement to bypass negotiations has any bearing on whether the standards ultimately imposed by the MPUC conflict with the Act. Fixed benchmarks impermissibly burden the ILEC

beyond what the Act requires to foster competition—interconnection of at least equal quality.

Further, it is neither noteworthy nor relevant to preemption analysis that the MPUC found that its minimum service quality standards "largely coincide[ ] with service quality standards" under Qwest's 1996 interconnection agreements with the CLECs and Qwest's AFOR plan. The MPUC's standards do not *entirely* coincide with the standards set in 1996 and Qwest's AFOR plan. But far more importantly, the Act envisions a system of negotiation and arbitration whereby the ILEC may ultimately agree to standards that exceed parity. Here, state regulators imposed such standards against Qwest's will.

when the parties are negotiating agreements under the Act, this phrase mandates only that the quality be equal—not superior. * * * Because the Commission's rule *requires* superior quality interconnection when requested, the rule is not supported by the Act's language." *Iowa Utils. Bd.*, 120 F.3d at 812–13 (internal citation omitted). Likewise, the MPUC order requiring superior quality interconnection must be voided as preempted by the Act's requirement of "at least equal quality."

The majority attempts to distinguish *Iowa Utilities* by noting that the F.C.C. rule at issue there required the ILEC to provide superior quality interconnection when requested, whereas the MPUC wholesale quality standards are fixed benchmarks of "measurable, predictable, and consistent quality." But this distinction is irrelevant to proper preemption analysis. If anything, this distinction shows the MPUCs order to be more at odds with the Act than the F.C.C. rule at issue in *Iowa Utilities*. The Act envisions negotiations establishing the quality of interconnection, parity being the starting point of those negotiations. The F.C.C. rule at least allowed for negotiated interconnection quality. The MPUC order, on the other hand, interjects fixed benchmarks into the mix—something entirely contrary to the market-based, competitive local phone service industry envisioned by the Act. *See* purpose statement, 110 Stat. at 56. That the benchmarks imposed by the MPUC are fixed and measurable may, to some observers, render them more sensible. But it does not change the fact that *requiring* superior quality interconnection conflicts with the 1996 Act's process of encouraging new market entries and reducing regulation.

Furthermore, the Act's requirement that state regulations designed to ensure quality or further competition be competitively neutral weighs against the majority's position. The majority argues that competitively neutral regulation may still impact competition because the Act expressly permits state regulation to further competition. But this merely states the obvious—competitive neutrality is a requirement, found in the savings clauses of the Act, placed on any state regulation designed to further competition. *See* 47 U.S.C. § 261(c). If the requirement of competitive neutrality is to have any meaning, it cannot merely be that a state regulation be designed to increase competition. Such an interpretation makes the Act redundant, essentially reading "competitive neutrality" out of the Act. Further, there is nothing in the Act to suggest that regulations aimed at "leveling the playing field" are competitively neutral. Rather, the deregulatory purpose and market-based approach of the Act suggest that competitive neutrality means just the opposite—aside from the specific duties the Act itself places on the ILEC in order to initiate competitive market entries, all other state regulations must not handicap or help the parties in the new competitive market the Act aims to construct. The majority argues that this interpretation reads the authorization for state regulations designed to foster competition or ensure quality out of the Act. On the contrary, this reading preserves a role for the states while supplying meaning to the phrase "competitive neutrality"—states may pass regulations designed to foster competition or ensure quality so long as they fairly apply to all players in the market. State regulations that assist some at the expense of others, even if designed to level the playing field, are directly contrary to the deregulatory philosophy and purpose of the Act and are therefore not saved from preemption by section 261(c).

Precedents from the Federal circuits support this view. In *Cablevision of Bos-*

*ton, Inc. v. Public Improvement Commission of Boston*, 184 F.3d 88, 105 (1st Cir. 1999), the court held that competitive neutrality regarding the sharing of rights-of-way did not impose an obligation to seek opportunities to level the playing field. In so holding, the court noted that "competitively neutral" as used in 47 U.S.C. § 253(c) (2000) requires that local regulations be promulgated "in a way that avoids creating unnecessary competitive inequities among telecommunications providers." *Cablevision of Boston*, 184 F.3d at 105. In *U.S. West v. M.F.S. Intelenet, Inc.*, 193 F.3d 1112, 1120 (9th Cir.1999), the court upheld interconnection agreements assigning the costs for number portability based on each exchange carrier's active local numbers. The court relied on an F.C.C. order holding that, while a mechanism assigning costs based on each exchange carriers active local numbers is "competitively neutral," a mechanism requiring new entrants to bear all the costs of number portability is not. *See In re Telephone Number Portability*, 11 F.C.C.R. 8352, 135, 138 (July 2, 1996). Forcing any carrier to shoulder a disproportionate share of the costs would violate the principle of competitive neutrality. Finally, *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67 (2d Cir.2002) stands for the proposition that competitive neutrality requires regulators to treat all exchange carriers even-handedly. There, the court held that a compensation fee placed on CLECs but not on the ILEC was not competitively neutral and noted that "a municipality may not * * * impose a host of compensatory provisions on one service provider without placing any on another." *Id.* at 80. The majority attempts to distinguish *TCG* by noting that the fee imposed by the city in that case burdened the CLECs while enhancing the position of the ILEC, whereas the fixed minimum performance standards here do not burden the ILEC. This is a distinction without a difference on two counts. First, to say that fixed performance standards do not burden Qwest is simply untrue. Qwest must meet fixed performance benchmarks that require superior quality service or pay penalties directly to its competitors, and Qwest is burdened enough to pursue litigation. Second, as discussed above, competitive neutrality, if it is to be a meaningful requirement, is not satisfied merely because a regulation attempts to level the playing field. On the contrary, the Act places specific duties on the ILEC to encourage new market entrants, and beyond that requires that state regulation conform to the market-based philosophy of the Act—in other words, be competitively neutral. That the ILEC was benefited and the CLEC was burdened in *TCG* is immaterial. The problem was that the city attempted to "impose a host of compensatory provisions on one service provider without placing any on another." *Id.* Likewise here, Qwest is burdened with fixed performance standards its competitors can ignore. This is anything but competitively neutral and is therefore contrary to the Act.

Congress in 1996 envisioned a new local phone service market stimulated by competition and less regulation. While the Act does place certain duties on ILECs in order to create a new, competitive market, those duties are narrow and well defined. Not only do the MPUC's wholesale service quality standards fundamentally alter those duties, but they are just the kind of inflexible regulations the Act seeks to supplant. In light of all of the foregoing, I would hold that the MPUC's order is preempted.